Receipt number AUSFCC-11209603

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| APPALACHIAN COMMUNITY CAPITAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civ. No. 26-562 C |

## COMPLAINT

1. This is a breach-of-contract action against the United States for unlawfully terminating a $500 million grant awarded to a non-profit financial institution to fund renewable energy projects in underserved areas. The United States, acting through the Environmental Protection Agency (EPA), violated the terms and conditions of the grant agreement by terminating it without cause in March 2025. The termination breached the government's contractual obligations. This action seeks monetary damages to remedy that breach.

2. Plaintiff, Appalachian Community Capital Corporation (ACC), is a non-profit Community Development Financial Institution (CDFI), certified by the United States Department of Treasury, that secures capital for small businesses in Appalachia and rural communities nationally.[1] On April 2, 2024, EPA selected ACC from a pool of competitive applicants to receive

[1] A CDFI is a mission-driven financial institution that has been certified by the U.S. Department of the Treasury's CDFI Fund. CDFIs include credit unions, banks, loan funds, and venture capital funds that operate with a primary mission of serving low-income communities by providing a variety of financial services, financial education opportunities, and affordable lending in their communities. *See Community Development Financial Institutions Fund*, available at: https://www.cdfifund.gov/faq (last visited Apr. 14, 2026).

$500 million to fund renewable energy projects through community lenders. Pursuant to this award, EPA and ACC entered into a binding grant agreement under which, in exchange for grant funding, ACC agreed to raise private capital and provide subgrants to local lenders to finance low- and zero-emission projects in underserved areas. In reliance upon the grant agreement, ACC initiated performance by hiring staff, engaging in community outreach, initiating fundraising efforts, forming the Green Bank for Rural America, reviewing twenty-two applications from community lenders for $327 million in funding, and awarding $67 million to nine subrecipients.

3. On March 11, 2025, EPA unilaterally terminated the grant agreement. The termination letter cited no findings or allegations of non-compliance or deficient performance by ACC. EPA conducted no substantive review of ACC's application, award, or performance and there was no evidence of fraud, waste, or abuse by ACC.

4. EPA's termination of the grant agreement violated the terms and conditions of the federal award, federal law, and federal regulations. The grant agreement permitted termination only upon a showing of material noncompliance, ineffective performance, misrepresentation of eligibility status, or waste, fraud, or abuse. EPA cited no evidence or allegation that ACC engaged in any such malfeasance.

5. Plaintiff files this suit to recover money damages for EPA's breach of the grant agreement.

## JURISDICTION & VENUE

6. Jurisdiction over the claims advanced in this case is proper in this Court pursuant to 28 U.S.C. § 1491 (the "Tucker Act").

## PARTIES

7. The Plaintiff, ACC, is a CDFI certified by the United States Treasury Department. In 2013, the Appalachian Regional Commission and its partners established ACC to increase business lending in the region through a simplified vehicle for investment that would reduce transaction costs. ACC is not a direct lender but rather raises capital for other mission-aligned lenders to provide affordable loans and other support to small businesses in disadvantaged areas. ACC and its members collectively manage over $4 billion in assets supporting development in underserved communities.

8. Defendant is the United States of America, acting through the United States Environmental Protection Agency and its Administrator, Lee Zeldin.

## BACKGROUND

### I. The Greenhouse Gas Reduction Fund & the Clean Communities Investment Accelerator

9. Congress established the Greenhouse Gas Reduction Fund based on its determination that a lack of capital investment in disadvantaged areas limited access to infrastructure that lowered energy costs and decreased pollution.

10. In 2022, Congress appropriated $27 billion for the specific purpose of funding zero-emission technology and development projects. This appropriation, known as the Greenhouse Gas Reduction Fund (GGRF), was part of the Inflation Reduction Act and an amendment to the Clean Air Act.[2] Its stated purpose was to reduce greenhouse gas emissions in low-income and disadvantaged communities.

11. Through Section 134 of the amended Clean Air Act, Congress provided statutory

[2] 42 U.S.C. § 7434 (repealed 2025).

authorization for EPA to bind the United States in grant agreements with funds from the GGRF.

12. Congress appropriated the $27 billion GGRF for fiscal year 2022, directed that EPA begin making grants not later than 180 calendar days after August 16, 2022, and provided that the appropriated funds would remain available until September 30, 2024. Thus, EPA had a 2-year period to award the funds that Congress appropriated.

13. Congress also appropriated an additional $30 million to EPA for administrative costs necessary to effectuate the GGRF programs.[3]

14. Upon enactment of the Inflation Reduction Act, EPA launched a stakeholder engagement strategy to help shape implementation of the GGRF.[4] EPA conducted listening sessions for members of the public and stakeholder groups on November 1 and November 9, 2022.[5] EPA published a Request for Information seeking public comment on core design aspects of the GGRF.[6] Further, EPA delivered a set of formal charge questions for expert review and comment at the October 18-19, 2022, meeting of the agency's Environmental Financial Advisory Board.[7]

15. On April 19, 2023, EPA released additional guidance on the implementation framework for the GGRF. The guidance split the majority of the $27 billion between national and community groups across three competitions: a $14 billion National Clean Investment Fund; a $6 billion Clean Communities Investment Accelerator (CCIA); and a $7 billion Solar for All competition.[8] Each competition was administered separately.

[3] 42 U.S.C. § 7424(a)(4) (repealed 2025).
[4] *See* Richard K. Lattanzio, Cong. Research Serv., IF12387, *EPA's Greenhouse Gas Reduction Fund* (GGRF) 1–2 (May 21, 2024), https://www.congress.gov/crs-product/IF12387.
[5] *See id.*
[6] *See id.*
[7] *See id.*
[8] *See id.*

16. On July 14, 2023, EPA released the $6 billion CCIA Notice of Funding Opportunity.[9] The program was designed to provide grants to support "hub" nonprofit organizations, which would then provide funding and technical assistance to public, quasi-public, not-for-profit, and non-profit community lenders working in low-income and disadvantaged communities. The expectation was that the hub nonprofits would enable hundreds of community lenders—such as community development financial institutions, credit unions, green banks,[10] housing finance agencies, and minority depository institutions—to finance clean technology projects in these underserved communities.[11]

17. On October 12, 2023, ACC submitted a detailed fifty-two-page application for CCIA grant funding. ACC spent significant time and resources preparing and submitting its application.

18. EPA's multi-staged review of applications and its selection process required dozens of federal employees—all screened through ethics and conflict of interest checks as well as trained on the CCIA program requirements and evaluation criteria—to participate in the review and scoring of the selected applications. The review and scoring process included expert review panels; interviews with senior officials; and recommendations from an expert, interagency senior review team.[12]

---

[9] *See id.*

[10] Green banks are public, quasi-public, or non-profit financial institutions that leverage public funds to attract private investment for renewable energy projects.

[11] *See* Press Release, EPA, Biden-Harris Administration Launches Historic $20 Billion in Grant Competitions to Create National Clean Financing Network as Part of Investing in America Agenda (July 14, 2023) https://www.epa.gov/newsreleases/biden-harris-administration-launches-historic-20-billion-grant-competitions-create.

[12] *See* Press Release, EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024) https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

19. On April 4, 2024, EPA awarded $6 billion in competitive CCIA grants to five coalitions of non-profit community lenders—including $500 million to ACC—to provide subgrants to community lenders to finance renewable energy projects in underserved communities.[13]

20. The CCIA award required the five selected applicants ("selectees") to act as hubs to provide funding and technical assistance to eligible community lenders working in low-income and disadvantaged communities. The award contemplated an immediate pathway to deploy renewable energy projects in those communities while also building capacity of hundreds of community lenders to finance additional projects. Each of the selectees was required to provide capitalization funding (typically up to $10 million per community lender), technical assistance subawards (typically up to $1 million per community lender), and technical assistance services so that community lenders could provide financial assistance to deploy distributed energy, net-zero buildings, and zero-emissions transportation projects.

## II. The Initial and Revised Grant Agreements

21. On August 8, 2024, EPA entered into a binding Grant Agreement with ACC, and obligated funding to ACC from the GGRF. The initial agreement incorporated by reference EPA's General Terms and Conditions, effective October 1, 2023. The agreement permitted grant recipients to incur costs (including pre-award costs) to advance the goals enumerated in the grant.

22. On October 1, 2024, EPA issued its annual update to its General Terms and Conditions.

23. On December 12, 2024, EPA and ACC entered into a revised Grant Agreement, which superseded the initial August 8, 2024, Grant Agreement. The revised Grant Agreement

---

[13] *See id.*

continued to authorize grant recipients to incur costs to advance the goals enumerated in the grant. It also (1) included additional requirements under the Build America, Buy America Act; (2) required compliance with EPA's updated 2024 General Terms and Conditions; and (3) limited the circumstances in which the grants could be terminated. Like the initial agreement, the revised Grant Agreement also required the grantees to enter into fiscal agent agreements under terms specified by EPA.

24. The binding revised Grant Agreement between Plaintiff ACC and EPA provided that "consistent with Section 134(b)(2) of the Clean Air Act, the Recipient will provide Capitalization Funding to Community Lenders for the sole purpose of financing CCIA-Eligible Projects."

25. The revised Grant Agreement defined a "CCIA-Eligible Project," in pertinent part, as a "Qualified Project," "within a Priority Project Category," "in a Low-Income and Disadvantaged Community."

26. The revised Grant Agreement, in turn, defined "Qualified Project" as it is defined in Section 134(c)(3) of the Clean Air Act: "any project, activity, or technology that (A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or (B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution."

27. Pursuant to the revised Grant Agreement, each Qualified Project was required to meet specified greenhouse-gas emissions criteria and deliver additional benefits in one of seven enumerated benefit categories. Further, the project was required to use only commercial technologies, defined as technologies that have been deployed for commercial purposes at least three times over a period of five years in the United States for the same general purpose as planned

for the project. The revised Grant Agreement also imposed financing conditions on each Qualified Project. The project, activity, or technology must have lacked other sources of financing, such that, without the CCIA financing, the project may not have otherwise been financed. Additionally, the project, activity, or technology was required to mobilize private capital. ACC was required to work through community lenders to make commercially reasonable efforts to provide leveraged funding from non-federal sources to supplement the federal funds disbursed to subrecipients.

28. The revised Grant Agreement, through EPA's 2024 General Terms and Conditions, claimed the right to "reproduce, publish, use, and authorize others to reproduce, publish, and use copyrighted works or other data developed under this assistance agreement for Federal purposes."

29. The revised Grant Agreement, through EPA's 2024 General Terms and Conditions, claimed right to a "worldwide, nonexclusive, nontransferable, irrevocable, paid-up license to practice [any] invention [made under this assistance agreement]."

30. The revised Grant Agreement imposed certain reporting requirements on ACC. For instance, ACC had to provide EPA with analytical testing results of environmental conditions and additional environmental and scientific testing, as well as reports, transaction-level and project-level data, organizational disclosures, and ongoing disclosures using authorized "information collection instruments." Further, ACC was required to report to EPA on environmental impact for the life of any projects funded under the revised Grant Agreement, beyond the term of the revised Grant Agreement itself.

31. The revised Grant Agreement mandated EPA participation in project activities and required ACC to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities and to provide federal representatives the opportunity to attend and participate.

32. The revised Grant Agreement also gave the following disposition options. With respect to real property, ACC could dispose of any real property obtained during performance under the Agreement and use the proceeds for the originally authorized purpose, or ACC could retain title to any real property and compensate EPA; sell the property and compensate EPA; or transfer title to EPA or to a third party designated/approved by EPA. With respect to program income, ACC was required to "retain Program Income earned during the Period of Performance," and add the funds "to funds committed to the program by EPA." Any interest earned on Program Income had to be deposited into Program Income accounts. The revised Grant Agreement's restrictions on the use of Program Income and any interest earned on Program Income extended beyond the term of the agreement until all such income and interest was exhausted. Finally, the revised Grant Agreement provided that "the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition."

**A. ACC's Performance Under the Initial and Revised Grant Agreements**

33. On August 8, 2024, as soon as ACC entered into the initial Grant Agreement, ACC received a portion of awarded funds into its Automated Standard Application for Payment (ASAP) account and began performing under the agreement.

34. On December 18, 2024, under the revised Grant Agreement and after extensive consultation with EPA, ACC submitted a workplan to EPA. The workplan proposed $450 million in funding to community lenders, mobilization of $1.2 billion in private capital, and reduction or avoidance of 2.5 million tons of greenhouse gas emissions over a seven-year period.

35. The workplan identified over 400 community lenders located in low-income and historically disadvantaged communities engaged in, or well-positioned to provide, green financing.

36. The workplan proposed capitalization, technical assistance, community engagement, and workforce development across all ten EPA regions nationwide to start and grow sustainable green lending programs.

37. The workplan set forth in detail ACC's investment assessment scoring procedures for reviewing applications; the stakeholder review committee evaluation process, focusing on community impact and likelihood of success; and the recommendation and decision-making process of the steering committee.

38. On or about December 20, 2024, EPA accepted ACC's workplan and budget under the revised Grant Agreement.

39. Between November 6, 2024, and December 27, 2024, the entirety of the $500 million award, less draws of $525,937, was transferred from the U.S. Treasury to the Fiscal Agent Account at Citibank For the Benefit Of ("FBO") ACC.

40. Between August 2024 and March 2025, ACC incurred significant expense performing under the initial and revised Grant Agreements. ACC formed the Green Bank for Rural America; engaged in extensive community outreach; solicited and reviewed applications from community lenders; and selected and funded subgrantees. ACC awarded $67 million to nine community lenders and incurred substantial administrative costs prior to receiving EPA's March 11, 2025, termination letter.

41. As outlined in ACC's approved workplan, ACC hired both full-time staff and contractors to implement the initial and revised Grant Agreements in late 2024 and early 2025, including a Chief Risk and Compliance Officer.

42. The total cost of the salaries and benefits of ACC's employees and contractors hired to implement the initial and revised Grant Agreements was over $1.8 million in the first year of performance.

43. As outlined in ACC's approved workplan, ACC operated the Green Bank for Rural America (Green Bank) as a wholly owned subsidiary for the sole purpose of executing grant activities. In late 2024 and early 2025, Green Bank hired and/or contracted with a Chief Executive Officer, Chief of Staff, Chief Investment Officer, Chief Operations and Financial Officer, Head of Technical Assistance Services, Chief Marketing and Communications Officer, and multiple investment officers to implement the grant activities.

44. As outlined in ACC's approved workplan, the total cost of the salaries and benefits of Green Bank's employees and contractors was over $3.3 million in the first year of performance.

45. Green Bank conducted extensive work building Technical Assistance "Hubs" to support community lenders that would finance eligible projects effectively and with the desired leverage and pollution reduction goals. Green Bank entered into multi-million-dollar contracts with community engagement and workforce development partners to provide robust technical assistance services in underserved communities, as required by the initial and revised Grant Agreements. Green Bank issued a national Request for Proposals (RFPs) for consultants to provide technical expertise to community lenders on energy generation and efficiency projects. Green Bank reviewed responses and began actively vetting providers. Green Bank also issued RFPs for

human resources, accounting, and IT services, received many proposals, and began actively evaluating them.

46. Through a series of online webinars, Green Bank engaged multiple audiences of more than 1,300 community members to provide information about the CCIA program.

47. In late 2024 and early 2025, members of the ACC Rapid Start Team and the CEO of Green Bank met with ACC stakeholders to develop strategies for identifying private capital. Staff met with more than half a dozen private banks regarding private funding.

48. On October 28, 2024, Green Bank opened the first round of funding to community lenders serving communities impacted by Hurricane Helene. These communities had been devastated by the Category 4 Hurricane. Green Bank received nine applications requesting $67 million in funding.

49. On December 4, 2024, Green Bank launched the Open Round for community lenders serving Appalachia and rural communities nationally. As of the March 11, 2025, termination date, Green Bank had received over thirteen applications requesting $260 million in funding. In addition, at least fifteen community lenders were ready to submit applications or indicated that they planned to apply later in the year.

50. In the first few months of 2025, in reliance on EPA's award to ACC, ACC through Green Bank issued capitalization and technical assistance awards to the nine community lenders for approximately $67 million to serve communities across five states, all ravaged by Hurricane Helene.

51. For example, on January 7, 2025, Green Bank awarded a total of $11 million to Mountain BizWorks, a non-profit CDFI based in Asheville, North Carolina. The $11 million award was made for capitalization and technical assistance to finance low and zero-emissions projects as

part of the rebuilding of areas of western North Carolina damaged by Hurricane Helene. Green Bank selected Mountain BizWorks as a subgrantee after conducting a detailed assessment that identified Mountain BizWorks as scoring in the top tier of every criterion for receiving an award. Green Bank concluded that Mountain BizWorks was well situated to execute on its plan to direct funds to small businesses seeking to benefit from the renewable energy economy and to attract private capital to achieve a 3:1 leverage goal.

52. Similarly, on January 14, 2025, Green Bank awarded a total of $3.4 million to Albany Community Together (ACT), a Georgia nonprofit, to assist communities in Southeast and Central Georgia hit by Hurricane Helene. The $3.4 million award was made for capitalization and technical assistance to finance low and zero-emission projects as part of the rebuilding of hurricane-ravaged areas and to increase resilience in other vulnerable communities. Green Bank selected ACT as a subgrantee after conducting a detailed assessment that identified ACT as having a long track record of serving small businesses, housing developers, and community facilities in southwest and central Georgia. ACT intended to use the award to support housing developers that retrofit existing housing stock to be more energy efficient and that rebuild infrastructure to be more flood resistant. In addition, ACT had a structured approach to meeting or exceeding 3:1 private leverage, including a bank warehousing line and participation in the state small business credit initiative.

53. Likewise, on January 29, 2025, Green Bank awarded a total of $11 million to Pathway Lending, a Tennessee nonprofit, to assist communities in eastern Tennessee and western North Carolina affected by Hurricane Helene. The $11 million award was made for capitalization and technical assistance to finance low and zero-emission projects as part of the rebuilding of areas devastated by the hurricane. Green Bank selected Pathway Lending as a subgrantee after

conducting a detailed assessment that identified Pathway Lending as having a long track record of serving the Appalachian region after natural disasters. Pathway Lending intended to use the award to provide loans at below-market rates to communities recovering from Hurricane Helene and to achieve at least 3:1 leverage of private capital.

54. Also on January 29, 2025, Green Bank awarded a total of $3,105,000 to Carolina Community Impact, Inc., a North Carolina nonprofit, to assist communities affected by Hurricane Helene. The $3,105,000 award was made for capitalization and technical assistance to finance low and zero-emission projects as part of the rebuilding of areas affected by Helene. Green Bank selected Carolina Community Impact, Inc. as a subgrantee after conducting a detailed assessment that concluded that Carolina Community Impact met or exceeded the criteria for receiving an award. Carolina Community Impact intended to use the award to increase financing for renewable energy projects in western North Carolina, support small businesses in the renewable energy sector, and support communities recovering from Hurricane Helene.

55. On February 26, 2025, Green Bank awarded a total of $11 million to CommunityWorks, a South Carolina-based nonprofit to assist communities affected by Hurricane Helene. The $11 million award was made for capitalization and technical assistance to finance low and zero-emission projects as part of the rebuilding of areas damaged by Hurricane Helene. Green Bank selected CommunityWorks as a subgrantee after conducting a detailed assessment that identified CommunityWorks as having a long track record of serving the state of South Carolina. CommunityWorks intended to use the award to provide long-term, low-cost loans for new or renovated housing to expand energy-efficient housing options for low- and moderate-income people across South Carolina. CommunityWorks had a track record of attracting private capital at a 12:1 ratio and expected to exceed the target of 3:1.

56. As a result of EPA's unlawful termination of the revised Grant Agreement, ACC and Green Bank were required to notify the subgrantees to cease all further program expenditures for this vital work. At the time EPA terminated the revised Grant Agreement, Mountain BizWorks had received funding from Green Bank for $10 million in capitalization grants and $1 million in technical assistance; five community lenders had signed investment agreements and were awaiting funding for $29.7 million in capitalization grants and $3.255 million of technical assistance from Green Bank; and three community lenders had not yet completed their investment agreements (totaling $21 million in capitalization grants and $2.1 million of technical assistance).

57. Due to EPA's unlawful termination of the revised Grant Agreement, ACC was only able to disburse funds to one subgrantee. That subgrantee was never able to access the funds, held in a designated Citibank Fiscal Agent Account, because EPA directed Citibank to freeze the funds. Further, due to EPA's unlawful termination of the revised Grant Agreement, ACC has been unable to disburse to subgrantees the remaining $56 million in funds it is contractually obligated to disburse because EPA also directed Citibank to freeze those funds.

**B. Termination under the Revised Grant Agreement and Federal Regulations**

58. The revised Grant Agreement, dated December 12, 2024, provided that EPA maintained the right to terminate the agreement "only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status."

59. On July 3, 2024, EPA published a Notice in the Federal Register announcing that it was applying "the revised version of 2 CFR 200.340 to EPA financial assistance agreements

awarded or amended to add funds on or after July 1, 2024."[14] In the Notice, EPA specified that "OMB revised 2 CFR 200.340(a)(4) to clarify that an agency may terminate a Federal award if it no longer effectuates the program goals or agency priorities (e.g. unilateral termination) but only when such language is clearly and unambiguously included in the terms and conditions of the award."[15]

60. EPA further specified in the Notice that OMB revised "2 CFR 200.340(b) to require agencies to 'clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.' 89 FR 30046, 30169, April 22, 2024."[16]

61. EPA's General Terms & Conditions, effective October 1, 2024, were also incorporated by reference in the revised Grant Agreement. The termination provision of the General Terms and Conditions did not permit termination based on shifting program goals or agency priorities for awards issued prior to April 3, 2025.

62. With respect to other bases for termination, the revised Grant Agreement defined "Materially Impaired" as:

> 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

[14] Applicability Date for the Office of Management and Budget's Regulatory Revisions, 89 FR 55262-63 (July 3, 2024), *available at* https://www.govinfo.gov/content/pkg/FR-2024-07-03/pdf/2024-14656.pdf (last visited Apr. 14, 2026).
[15] *Id.* at 55263.
[16] *Id.*

63. The revised Grant Agreement defined "Waste, Fraud, or Abuse" as "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

64. With respect to costs during any suspension or termination, the revised Grant Agreement provided that "costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect."

65. Section 200.339 of Title Two of the Code of Federal Regulations addresses remedies for non-compliance with terms and conditions of a federal award. The Section provides in pertinent part that where a federal agency "determines that noncompliance cannot be remedied by imposing specific conditions," the federal agency may (a) temporarily withhold payments; (b) disallow costs; or (c) suspend or terminate the award in part or in its entirety.[17]

66. Section 200.340 of Title Two of the Code of Federal Regulations addresses termination. Section 200.340(a)(1) & (4) provide that a federal grant may be terminated if "the recipient . . . fails to comply with the terms and conditions," or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."[18] Section 200.340(b) specifies, however, that

[17] 2 C.F.R. § 200.339.
[18] 2 C.F.R. § 200.340(a)(1) & (4).

"the Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."[19]

67. The Office of Management and Budget's (OMB's) Federal Financial Assistance regulations permit an agency to terminate a Federal award if it no longer effectuates the program goals or agency priorities (e.g. unilateral termination) only when "pursuant to the terms and conditions of the Federal award."[20] OMB requires agencies to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."[21]

68. These provisions were adopted on April 22, 2024, and made effective October 1, 2024.[22] OMB authorized Federal agencies to apply the changes to Federal awards issued prior to October 1, 2024, for any award issued on or after June 21, 2024. Specifically, OMB's guidance provides: "Federal agencies may elect to apply the final guidance to Federal awards issued prior to October 1, 2024, but they are not required to do so. For agencies applying the final guidance before October 1, 2024, the effective date of the final guidance must be no earlier than June 21, 2024."[23]

69. As referenced above, EPA elected to apply the revised version of 2 CFR 200.340 to EPA financial assistance agreements awarded or amended to add funds on or after July 1, 2024.[24]

70. EPA's initial Grant Agreement with ACC was executed on August 2, 2024. EPA superseded the initial Grant Agreement with a revised Grant Agreement on December 12, 2024.

---

[19] 2 C.F.R. § 200.340(b).
[20] *See* Guidance for Federal Financial Assistance, Section 200.340—Termination, 89 FR 30046, 30089 (Apr. 22, 2024), *available at* https://www.federalregister.gov/documents/2024/04/22/2024-07496/guidance-for-federal-financial-assistance (last visited Apr. 14, 2026).
[21] *Id.*
[22] *See id.*
[23] *Id.*
[24] *See id.*

71. Neither the original nor the revised Grant Agreement provided for termination based on shifting program goals or agency priorities.

**C. The Termination Letter**

72. On March 11, 2025, EPA issued a letter terminating the revised Grant Agreement with ACC. The letter cited "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." The letter did not cite any evidence of performance issues, noncompliance with the terms and conditions of the original or revised Grant Agreement, or waste, fraud, or material misrepresentation of eligibility status by ACC.

73. The Termination Letter also generally referenced "multiple ongoing independent federal investigations" and "material deficiencies" regarding "adequate oversight and account controls to prevent financial mismanagement;" "improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities;" and "the circumvention and defeat of key oversight mechanisms." The letter did not allege or cite findings that ACC was involved in or at fault for any of the purported "material deficiencies."

74. Finally, the Termination Letter referenced "Sections III.R and III.S.3 of the revised Grant Agreement." Section III.R of the revised Grant Agreement addresses remedies for non-compliance. Section III.S.3 provides for progress checks beginning within 90 calendar days of June 30, 2025, and a corrective action plan if the EPA Project Officer were to determine that ACC had not made sufficient progress. The letter did not allege or cite any instance of ACC failing to comply with the terms and conditions of the initial or revised Grant Agreement and did not allege or cite findings that ACC had failed to make sufficient progress in performing under the initial or revised Grant Agreement.

75. The Termination Letter did not cite any actionable basis for termination.

76. Pursuant to the Termination Letter, EPA instructed Citibank to withhold the entire remaining balance of the funds disbursed to ACC, totaling nearly $500 million, including $67 million awarded to subrecipients—$11 million of which Green Bank had already disbursed to a subrecipient at another Citibank account.

77. In terminating the revised Grant Agreement, EPA committed a clear and material breach of the terms and conditions of the revised Grant Agreement entered between the EPA and ACC. The terms and conditions expressly limited the grounds for termination to three circumstances: (1) substantial noncompliance with the terms and conditions of the agreement that materially impaired performance, (2) adequate evidence of waste, fraud, or abuse, or (3) material misrepresentation of eligibility status. None of those conditions were satisfied here.

78. The termination was not "authorized by law."

79. ACC materially complied with all terms and conditions of the initial and revised Grant Agreements; there was no material impairment of performance; there was no evidence of fraud, waste, or abuse; and there was no misrepresentation of eligibility status. ACC and Green Bank, in good faith, and in reliance on the initial and revised Grant Agreements, undertook substantial performance and awarded and obligated $67 million to effectuate the purposes of the initial and revised Grant Agreements.

**III. Harm to ACC**

80. The EPA terminated ACC's revised Grant Agreement, ordered ACC to stop working, and rendered the entire balance of the $500 million award unavailable to ACC, including $67 million that the Green Bank awarded to subrecipients prior to termination. Green Bank

disbursed $11 million of the $67 million to a subrecipient prior to termination, but EPA also blocked that subrecipient from accessing the funds.

81. In reliance on the initial and revised Grant Agreements, ACC and Green Bank initiated performance and planned a decade of capitalization, fundraising, technical assistance, and financing for renewable energy projects in underserved areas. ACC built Green Bank specifically to implement its obligations under the initial and revised Grant Agreements and Green Bank is now immobilized because of EPA's unlawful termination.

82. The EPA's actions—including terminating the revised Grant Agreement and ordering ACC to stop work—harmed ACC. ACC wasted resources, obligated itself financially, and lost access to the funds awarded and transferred to ACC's Fiscal Agent FBO Account at Citibank pursuant to the initial and revised Grant Agreements. ACC incurred substantial costs in preparing to perform under the Agreement. Moreover, absent relief, ACC will no longer be able to provide subgrants that it is contractually obligated to provide. ACC will no longer be able to finance (through subgrantees) $1.6 billion in renewable energy projects in low income and underserved communities that would have leveraged $1.2 billion of private capital to finance an anticipated 2,750 projects, which would have created 13,000 jobs. These projects were anticipated to reduce energy use by 500,000 megawatts annually and generate 230 megawatts of new renewable energy each year, thus lowering costs while increasing renewable energy supplies and resilience in Appalachia and other rural parts of the country.

## <u>CLAIMS FOR RELIEF</u>

### COUNT I
### Breach of the CCIA Revised Grant Agreement

83. Plaintiff ACC incorporates by reference the allegations contained in the preceding paragraphs.

84. To recover for breach of contract, ACC must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."[25]

85. The revised Grant Agreement is a binding contract that contemplates money damages.

86. The revised Grant Agreement was entered into by EPA officials with authority to bind the United States.

87. EPA breached the express terms of the revised Grant Agreement by wrongfully terminating the revised Grant Agreement.

88. The initial and revised Grant Agreements contain a provision by which EPA agreed to make a specified amount of federal funds available to ACC for its CCIA grant-making projects.

89. In the revised Grant Agreement, EPA and ACC mutually agreed to limit EPA's unilateral termination rights under 2 C.F.R. § 200.339 and 2 C.F.R. § 200.340 to situations involving Material Impairment; Waste, Fraud, or Abuse; or misrepresentation of eligibility status.

90. EPA claimed its termination of the revised Grant Agreement was due to "concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities."

91. The revised Grant Agreement did not permit termination based on "concerns."

92. The revised Grant Agreement did not permit termination based on "program integrity."

93. The revised Grant Agreement did not permit termination based on "misalignment with the Agency's priorities."

---

[25] *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

94. The revised Grant Agreement did not permit termination based on "fraud, waste, and abuse," at the "programmatic" level unrelated to ACC's performance, and did not permit termination based on any other fraud, waste, or abuse absent adequate evidence.

95. The revised Grant Agreement did not permit termination based on shifting agency goals or priorities.

96. EPA's unilateral termination of the revised Grant Agreement violated the terms and conditions of the revised Grant Agreement and violated federal law and regulations.

97. EPA's breach of the revised Grant Agreement caused ACC to suffer damages in an amount to be determined at trial.

**COUNT II**
**Breach of the Duty of Good Faith and Fair Dealing**

98. Plaintiff ACC incorporates by reference the allegations contained in the preceding paragraphs.

99. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement."[26]

100. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'"[27]

101. The revised Grant Agreement is a binding contract that contemplates money damages.

---

[26] *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (additional citations omitted).
[27] *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

102. The revised Grant Agreement was entered into by EPA officials with authority to bind the United States.

103. EPA breached the express terms of the revised Grant Agreement by wrongfully terminating the revised Grant Agreement.

104. The revised Grant Agreement provided that EPA would make $500 million available to ACC for the CCIA program.

105. ACC entered into the initial and revised Grant Agreements with EPA with the reasonable expectation that EPA would comply with the terms of the Grant Agreements and that EPA would act in good faith and deal fairly with ACC.

106. EPA breached the revised Grant Agreement's implied duty of good faith and fair dealing.

107. EPA targeted the revised Grant Agreement with ACC for unilateral termination without actionable basis. EPA's stated reasons for termination were not valid under the terms and conditions of the revised Grant Agreement and were instead pretextual, based on a fundamental disagreement with policy goals underlying renewable energy programs.

108. EPA terminated the revised Grant Agreement with ACC knowing that no condition for termination had been met. EPA manufactured alternative bases and cited those bases in the Termination Letter without adequate evidence.

109. EPA directed ACC to stop work under the revised Grant Agreement, froze funds already awarded, obligated, and disbursed to ACC, and prevented ACC from spending funds already disbursed to it.

110. On information and belief, EPA intentionally interfered with ACC's performance under the revised Grant Agreement and destroyed ACC's reasonable expectation regarding the

fruits of the revised Grant Agreement despite recognizing that the revised Grant Agreement did not permit termination under the existing circumstances.

111. On information and belief, EPA intended to interfere with ACC's operation under the CCIA program without legal authority or basis and knowing that there was no sufficient basis for termination.

112. EPA's actions caused ACC to suffer substantial damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the United States as follows:

i. Awarding money damages to Plaintiff in an amount to be determined at trial;

ii. Awarding any allowable pre- and post-judgment interest;

iii. Awarding Plaintiff their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

iv. Grant other such relief as this Court may deem proper and just.

Dated April 16, 2026

Respectfully submitted,

**Walden Macht Haran & Williams LLP**

By: /s/ John D. Keller

John D. Keller (DC Bar 90035343)
1120 20th St. NW, Suite 360
Washington, DC 20036
Tel: (202) 212-6020
jkeller@wmhwlaw.com

Samuel Rosh (*pro hac vice* motion forthcoming)
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2983
srosh@wmhwlaw.com

**Democracy Defenders Fund**

By: /s/ Lindsay W. Zimliki

Lindsay W. Zimliki
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
lindsay@democracydefenders.org

*Attorneys for Plaintiff*