**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| APPALACHIAN COMMUNITY CAPITAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 26-562 C<br><br>(Dietz, J.) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: November 2, 2026


Jeffrey A. Udell
Samuel J. Rosh
**WALDEN HARAN WILLIAMS LLP**
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
judell@whwllp.com
srosh@whwllp.com

Lindsay W. Zimliki
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
lindsay@democracydefenders.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT .....1

BACKGROUND .....2

I. ACC's Service to Appalachian Communities and Certification by the Federal Government .....2

II. The Greenhouse Gas Reduction Fund and the Clean Communities Investment Accelerator .....3

III. ACC's Application for and Award of a CCIA Grant .....4

IV. The Grant Agreement Between ACC and EPA .....7

V. ACC's Work Under the Grant Agreement and Investments in Low- and Zero-Emissions Projects .....9

VI. The Revised Grant Agreement .....11

VII. EPA's Abrupt Termination of the Grant Agreement .....14

LEGAL STANDARD .....19

ARGUMENT .....19

I. This Court Has Tucker Act Jurisdiction Over ACC's Claims .....20

II. ACC is Entitled to Partial Summary Judgment on Liability for its Contract Claim .....22

A. The Grant Agreements Are Contracts .....23

B. The Grant Agreements Imposed Obligations and Duties Arising Out of the Contracts .....28

C. EPA Breached the Operative Revised Grant Agreement by Failing to Terminate on an Authorized Ground .....29

D. EPA's Breach Caused ACC Damages .....33

CONCLUSION .....37

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Am. Cap. Corp. v. F.D.I.C.*,
472 F.3d 859 (Fed. Cir. 2006) ... 36

*Am. Council of Learned Societies v. Nat'l Endowment for the Humans.*,
2026 WL 1256545 (S.D.N.Y. May 7, 2026) ... 32

*Anderson v. United States*,
23 F.4th 1357 (Fed. Cir. 2022) ... 19

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) ... 20, 34

*Cardiosom, L.L.C. v. United States*,
656 F.3d 1322 (Fed. Cir. 2011) ... 29

*Claude Mayo Constr. Co. v. United States*,
132 Fed. Cl. 634 (2017) ... 28

*Climate United Fund v. Citibank, N.A.*,
154 F.4th 809 (D.C. Cir. 2025), *vacated on rehearing en banc*, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025) ... 22

*Climate United Fund v. Citibank, N.A.*,
184 F.4th 679 (D.C. Cir. 2026) (en banc) ... 22

*Climate United Fund v. Citibank, N.A.*,
778 F. Supp. 3d 90 (D.D.C. 2025) ... 21

*Climate United Fund v. Citibank, N.A.*,
2026 WL 2450279 (D.C. Cir. Aug. 7, 2026) ... 22

*Cmty. Rels.-Soc. Dev. Comm'n in Milwaukee Cnty. v. United States*,
8 Cl. Ct. 723 (1985) ... 23

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ... passim

*Crestview Clinical Lab'y, LLC v. United States*,
181 Fed. Cl. 1 (2026) ... 29

*Cuyahoga Metro. Hous. Auth. v. United States*,
57 Fed. Cl. 751 (2003) ... 2, 33, 37

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ........ 20

*Exxon Mobil Corp. v. United States*,
101 Fed. Cl. 576 (2011) ........ 2

*Gardiner, Kamya & Assocs., P.C. v. Jackson*,
369 F.3d 1318 (Fed. Cir. 2004) ........ 26

*Gateway Dev. Comm'n v. United States*,
180 Fed. Cl. 495 (2026) ........ 31

*Harris Cnty. v. U.S. Env't Prot. Agency*,
--- F. Supp. 3d ---, 2026 WL 2837849 (D.D.C. Sept. 22, 2026) ........ 28

*Holland v. United States*,
74 Fed. Cl. 225 (2006) ........ 2

*Hometown Fin., Inc. v. United States*,
409 F.3d 1360 (Fed. Cir. 2005) ........ 23

*Hous. Auth. of Slidell v. United States*,
149 Fed. Cl. 614 (2020) ........ 33, 35

*Idaho Migrant Council v. United States*,
9 Cl. Ct. 85 (1985) ........ 31

*JKB Sols. & Servs., LLC v. United States*,
18 F.4th 704 (Fed. Cir. 2021) ........ 32

*LaBatte v. United States*,
899 F.3d 1373 (Fed. Cir. 2018) ........ 36

*Laborant, LLC v. United States*,
180 Fed. Cl. 76 (2026) ........ 25

*Mass. Bay Transp. Auth. v. United States*,
129 F.3d 1226 (Fed. Cir. 1997) ........ 35

*McGee v. Mathis*,
71 U.S. 143 (1866) ........ 25

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ........ 20, 22

*New Jersey v. U.S. Off. of Mgmt. & Budget*,
837 F. Supp. 3d 258 (D. Mass. 2026) ........ 30, 31

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ........ 37

*Oliva v. United States*,
961 F.3d 1359 (Fed. Cir. 2020) ........ 22

*Ravi v. United States*,
104 F.4th 1359 (Fed. Cir. 2024) ........ 36

*Rhode Island AFL-CIO v. U.S. Env't Prot. Agency*,
--- F. Supp. 3d ---, 2026 WL 2797310 (D.R.I. Sept. 18, 2026) ........ 28

*San Juan City Coll. v. United States*,
391 F.3d 1357 (Fed. Cir. 2004) ........ 33

*SGS-92-X003 v. United States*,
85 Fed. Cl. 678 (2009) ........ 35

*Sonoma Apartment Assocs. v. United States*,
124 Fed. Cl. 595 (2015) ........ 2, 33, 37

*State of California v. U.S. Dep't of Educ.*,
--- F. Supp. 3d ---, 2026 WL 2754968 (D. Mass. Sept. 17, 2026) ........ 31

*Stathis v. United States*,
120 Fed. Cl. 552 (2015) ........ 2, 19

*Thermalon Indus., Ltd. v. United States*,
34 Fed. Cl. 411 (1995) ........ 23, 25

*Ute Indian Tribe v. United States*,
99 F.4th 1353 (Fed. Cir. 2024) ........ 22

*WaveLink, Inc. v. United States*,
154 Fed. Cl. 245 (2021) ........ 37

**<u>Statutes</u>**

28 U.S.C. § 1491 ........ 20

Pub. L. No. 117-169, § 60103, 136 Stat. 1818 (2022) ........ 3, 4

Pub. L. No. 119-21, § 60002, 139 Stat. 72 (2025) ........ 28

**<u>Other Authorities</u>**

Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 20, 2025) ........ 14

Restatement (Second) of Contracts § 71 cmt. D ........ 25

**Rules**

RCFC 56(a) ........ 19

RCFC 56(g) ........ 37

**Regulations**

2 C.F.R. § 200.339 ........ 31

2 C.F.R. § 200.340 ........ 8, 9, 30

Plaintiff Appalachian Community Capital Corporation ("ACC") respectfully submits this memorandum of law in support of its motion for partial summary judgment with respect to liability for breach of contract under Count I of ACC's Complaint.

## PRELIMINARY STATEMENT

In 2024, the United States Environmental Protection Agency ("EPA") entered into a grant agreement with ACC whereby it agreed to provide $500 million to ACC in exchange for ACC's agreement to raise additional private capital that it would use—along with the $500 million—to make renewable energy investments in underserved, rural communities in Appalachia and nationwide. By late 2024, EPA had disbursed the entire $500 million to ACC, subject to the terms and conditions of the grant agreement.

ACC held up its end of the bargain. ACC performed under the grant agreement, at significant expense, in 2024 and early 2025 by hiring executives and staff, building technical assistance hubs, issuing requests for proposals, reviewing applications for funding, and obligating an initial $67 million to local lenders to serve communities across five states in Appalachia, all recovering from Hurricane Helene.

EPA, by contrast, swiftly breached its contractual obligations. On March 11, 2025, EPA issued a unilateral, unsupported termination letter to all grant recipients, including ACC, and pressured Citibank—the financial agent chosen by EPA to hold the grant funds on behalf of ACC and other grantees—to freeze all grant funds under the relevant program, including those belonging to ACC. The stated basis for the termination was not any noncompliance by ACC or any other permissible ground for termination but rather concerns with the overall program and "misalignment with the agency's priorities." While EPA did not state what those priorities were, public statements made by Administrator Lee Zeldin and official EPA position statements posted on its website indicate that EPA's decision to terminate the grants was due to the new

administration's disagreement with the prior administration's financial—and contractually binding—commitment to renewable energy investments.

EPA's termination, for such impermissible reasons, thus constituted a breach of contract. ACC has been left with unsatisfied obligations and expenses and without access to the nearly $500 million in unexpended grant funds, along with additional program income that ACC was authorized to retain under the grant agreement.

Accordingly, this Court should grant ACC's motion for partial summary judgment on the issue of the government's liability with respect to Count I of the Complaint (for breach of contract), which rests on undisputed facts and will streamline the litigation.[1]

## BACKGROUND

### I. ACC's Service to Appalachian Communities and Certification by the Federal Government

Founded in 2013, ACC annually invests millions of dollars to provide grants and loans to underserved, rural communities to aid community, economic, and social development in the thirteen states comprising Appalachia. *See* Ex. 2 ("Grant Application") at 2; Decl. of Daniel Wallace ("Wallace Decl.") ¶¶ 3–4. ACC provides grants and loans to small businesses, non-profits, and local financial institutions in underserved, rural communities so that those communities can benefit from growing economic opportunities, increased entrepreneurship, and

[1] Plaintiff moves for summary judgment on liability as to Count I of its Complaint only and intends to present its evidence on the quantum of damages at a future time. *See, e.g.*, *Stathis v. United States*, 120 Fed. Cl. 552, 560, 566 (2015) (granting plaintiff's motion for partial summary judgment on liability for breach of contract because "[c]ontract interpretation is a question of law, which poses an appropriate question for summary judgment resolution"); *Sonoma Apartment Assocs. v. United States*, 124 Fed. Cl. 595, 601 (2015) (similar); *Exxon Mobil Corp. v. United States*, 101 Fed. Cl. 576, 578 (2011) (similar); *Holland v. United States*, 74 Fed. Cl. 225, 264 (2006) (similar); *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 753, 781–82 (2003) (similar).

higher quality jobs. Wallace Decl. ¶ 4. ACC has had remarkable success, with its grants reaching more than 20,000 regional businesses and supporting tens of thousands of local jobs. *Id.* In recognition of its record of providing affordable financial products and services to economically distressed communities, ACC was certified by the United States Department of the Treasury as a Community Development Financial Institution ("CDFI") in 2016. Grant Application at 2; Wallace Decl. ¶ 5.[2] Such CDFI certification requires institutions like ACC to follow "clear standards for responsible lending," including "standards for accountability" which, in turn, allow CDFIs to serve as "essential partners in the Treasury Department's efforts to invest in financially underserved rural and urban communities."[3] ACC's reputation and performance thus made it a natural candidate when EPA sought responsible, accountable partners with the proven record to serve as a hub for community lenders making renewable energy investments in local communities.

## II. The Greenhouse Gas Reduction Fund and the Clean Communities Investment Accelerator

In 2022, Congress passed and President Biden signed the Inflation Reduction Act, which included a $27 billion appropriation for zero-emission technology and development projects, known as the Greenhouse Gas Reduction Fund ("GGRF"). *See* Pub. L. No. 117-169, § 60103, 136 Stat. 1818, 2065–67 (2022). Congress authorized EPA to identify private partners who could, in turn, provide "grants, loans, or other forms of financial assistance, as well as technical assistance,

[2] A CDFI is a mission-driven financial institution that has been certified by the U.S. Department of the Treasury's CDFI Fund. CDFIs include credit unions, banks, loan funds, and venture capital funds that operate with a primary mission of serving low-income communities by providing a variety of financial services, financial education opportunities, and affordable lending in their communities. *See* Community Development Financial Institutions Fund, *available at* https://www.cdfifund.gov/faq [https://perma.cc/23W9-GVNS].

[3] Press Release, *U.S. Treasury Department Updates Certification Application for Community Development Financial Institutions to Promote Responsible Lending to Financially Underserved Communities* (Dec. 7, 2023), https://home.treasury.gov/news/press-releases/jy1967 [https://perma.cc/95QH-2KKB]; *see also* Wallace Decl. ¶ 5.

to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies[.]" *Id.* Congress thereby provided statutory authority for EPA to bind the United States in grant agreements with funds from the GGRF, and provided that appropriated funds would "remain available until September 30, 2024, to make grants, on a competitive basis." *Id.* On April 19, 2023, EPA announced that the majority of GGRF's funds would be divided between national and community groups across three competitions: a $14 billion National Clean Investment Fund; a $7 billion Solar for All competition; and a $6 billion Clean Communities Investment Accelerator ("CCIA"), the program at issue here.[4]

### III. ACC's Application for and Award of a CCIA Grant

After the enactment of the Inflation Reduction Act, EPA followed a rigorous process to identify organizations that could serve as its contracting partners. EPA conducted listening sessions; sought public comment on the design of the GGRF; and on July 14, 2023, issued a Notice of Funding Opportunity that solicited applications from so-called "hub" nonprofit organizations, which could in turn provide funding and technical assistance to "community lenders" serving "low-income and disadvantaged communities." Ex. 1 ("Notice of Funding Opportunity") at 3–4. According to the Notice of Funding Opportunity, EPA's grants, pursuant to the Inflation Reduction Act, were intended to promote "the three GGRF program objectives of reducing emissions of greenhouse gases and other air pollutants; delivering benefits to American communities, particularly low-income and disadvantaged communities; and mobilizing financing and private capital." *Id.* at 5. EPA structured the CCIA program to continue beyond the grant's period of

---

[4] Press Release, *EPA Releases Framework for the Implementation of the Greenhouse Gas Reduction Fund as Part of President Biden's Investing in America Agenda* (Apr. 19, 2023), https://www.epa.gov/newsreleases/epa-releases-framework-implementation-greenhouse-gas-reduction-fund-part-president [https://perma.cc/X8U3-AA5X].

performance, and EPA required recipients to retain program income generated by investments and other activities and to continue using those funds for green energy projects into the future. *Id.* at 20, 58. EPA's review process included an evaluation of each applicant's mission, investment strategy, reporting plan, budget, organizational background and track record, governance and management structure, and financial history. *Id.* at 22–23, 32–42. EPA's selection process required a "review panel" of EPA employees to participate in the review and scoring of applications, to be followed by interviews for "top-ranked applications." *Id.* at 55–56.[5] As part of the application process, ACC was also required to submit a detailed budget for EPA's review. Notice of Funding Opportunity at 71–74.

On October 12, 2023, ACC submitted a detailed fifty-two-page application for CCIA grant funding, along with numerous appendices, letters of support, and other material. Wallace Decl. ¶ 8; *see* Ex. 2 ("Grant Application"). ACC spent hundreds of hours on the application, which explained ACC's plan to use the funding to support its nationwide network of community lenders to catalyze investment in energy generation and storage, energy efficient buildings, and electric vehicle transportation infrastructure. *Id.* As ACC explained, it was well positioned to partner with EPA in light of its long, successful history investing in renewable energy projects in Appalachia and its strong governance and compliance practices. Grant Application at 7–15, 23–25, 39–48, 51–52.

ACC's application was graded by numerous reviewers within EPA and other government agencies. Notice of Funding Opportunity at 55–56. In December 2023, ACC was notified that it

---

[5] *See also* Press Release, *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America* (Apr. 4, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and [https://perma.cc/L4R9-5LCK].

was a highly rated applicant and was invited to interview with senior EPA officials in January 2024. Wallace Decl. ¶ 9.

On March 31 and April 3, 2024, EPA notified ACC that EPA had chosen to fund ACC's application for a CCIA grant. *See* Ex. 3 ("Notification of Selection"). On April 4, 2026, EPA officially announced awards of $6 billion in CCIA grants to five non-profit community lenders, including $500 million to ACC, to provide subgrants to community lenders that could finance renewable energy projects in underserved communities.[6] EPA notified ACC, however, "that selection does not guarantee a final award" and that a final award was contingent on, among other things, ACC's entering into a formal grant agreement and other preparatory steps. Notification of Selection at 2; *see also* Notice of Funding Opportunity at 57 (advising applicants that a notice of award "does not guarantee an award will be made" and that a formal grant agreement would be required "to bind the Government to the expenditure of funds"). Still, EPA notified ACC that it could begin incurring so-called "pre-award costs" pending the execution of a formal grant agreement, so long as those pre-award costs were included in ACC's workplan and budget. Notification of Selection at 2. Accordingly, ACC worked with EPA to complete the steps required to finalize the grant award, including submission of a workplan and budget, negotiating terms and conditions of the award, and completing other steps required by EPA. Wallace Decl. ¶ 11. EPA published ACC's workplan on EPA's website in or around mid-August 2024. *Id.* ¶ 12.

---

[6] *See* Press Release, EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024) https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and [https://perma.cc/DN3B-3BGW]; *see also* Notification of Selection; Wallace Decl. ¶¶ 10–11.

## IV. The Grant Agreement Between ACC and EPA

EPA's agreement with ACC was memorialized in a contract. On August 8, 2024, EPA entered a binding sixty-one page "Grant Agreement" with ACC and, per the terms of the contract, obligated funding to ACC from the GGRF. *See* Ex. 4 ("Grant Agreement" or "Initial Grant Agreement"); Wallace Decl. ¶ 12. The Grant Agreement imposed contractual obligations on both ACC and EPA, providing that EPA "hereby awards $500,000,000.00" to ACC and "agrees to cost-share 100.00% of all approved budget period costs incurred" for the entirety of the project period, which was listed on the Grant Agreement as "04/01/2024 - 03/31/2030." Grant Agreement at 1 (emphasis in original). The Grant Agreement also permitted ACC to seek reimbursement for "pre-award costs," namely costs that were incurred before the parties entered the contract. *Id.* at 5–6. And the Grant Agreement provided that "program income" (including interest accrued on the awarded funds) would "be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance[.]" *Id.* at 23, 55–56. ACC, in turn, agreed to "utilize the funding to reduce emissions of greenhouse gases and other air pollutants" by funding "clean energy investments" and undertaking "robust community engagement and workforce development." *Id.* at 4.

ACC further agreed to provide technical assistance to its sub-grantees and to comply with various federal reporting requirements. *Id.* at 14–17. In particular, EPA required the selected applicants to act as hubs to provide funding and technical assistance to subgrant community lenders. *Id.* at 26–27, 30. Each of the selectees was required to provide a mixture of capitalization funding, technical assistance awards, and technical assistance services so that community lenders could provide financial assistance to deploy distributed energy, net-zero buildings, and zero-emissions transportation projects. *Id.* ACC committed to use "commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved workplan," which

explained how ACC intended to deploy additional private capital to supplement the public funding being invested in local communities. *Id.* at 20. And ACC agreed to numerous other contractually binding commitments, including to comply with certain corporate governance requirements, *id.* at 35, financial risk management procedures, *id.* at 37, and conflict of interest rules, *id.* at 44, and to open a deposit account in which the $500 million award would be held, *id.* at 58. The Grant Agreement specified that, "[u]pon establishment of [that] Deposit Account, the Recipient will drawdown the entire available EPA award balance from ASAP [Department of the Treasury's Automated Standard Application for Payment account] and disburse it into the Deposit Account[.]" *Id.*

The Grant Agreement expressly limited the grounds for termination to (1) substantial and material noncompliance with the terms and conditions or (2) adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse. *Id.* at 41–42. That was notably narrower than the "Termination" provision that might otherwise have applied. The "Termination" provision of EPA's General Terms and Conditions Effective October 1, 2023 permitted EPA to terminate "[c]onsistent with 2 CFR 200.340" if (a) "a recipient fails to comply with the terms and conditions of the award including statutory or regulatory requirements" or (b) "the award no longer effectuates the program goals or agency priorities[.]"[7]

The "Termination" provision of the Grant Agreement's terms and conditions, however, expressly applied termination grounds set forth in a revised version of 2 C.F.R. § 200.340, which became effective on July 3, 2024, and which only allowed EPA to terminate if "an award no longer

[7] Env't Prot. Agency, *General Terms and Conditions Effective October 1, 2023*, at 2–3, available at https://www.epa.gov/system/files/documents/2023-09/fy_2023_epa_general_terms_and_conditions_effective_october_1_2023_or_later.pdf [https://perma.cc/R6Q7-C2RF].

effectuates the program goals or agency priorities" *if such language was clearly and unambiguously included in the terms and conditions of the award itself, notwithstanding the broader bases for termination outlined in the EPA General Terms and Conditions*.[8] The Grant Agreement's termination provision provided:

> Notwithstanding the General Term and Condition "Termination," EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and *the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024)*, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility status, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.

Grant Agreement at 41–42 (emphasis added).

The Grant Agreement's "Termination" provision thus limited the grounds for termination to those expressly stated in the Grant Agreement. *See* 2 C.F.R. § 200.340(b) (July 3, 2024).

## V. ACC's Work Under the Grant Agreement and Investments in Low- and Zero-Emissions Projects

ACC continued its work under the Grant Agreement, as it had since the EPA had officially announced ACC's application had been selected for funding on April 4, 2024. *See* Wallace Decl. ¶ 11; Dkt. 15 ("Answer") ¶ 33. On August 8, 2024, the date that ACC entered into the Grant

---

[8] On April 22, 2024, the Office of Management and Budget ("OMB") published its Final Rule and Guidance revising the OMB Guidance for Federal Financial Assistance, including clarifying and updating the rules for when federal awards may be terminated. 89 Fed. Reg. 30046, 30089–90 (Apr. 22, 2024). OMB's revision to the regulations, including the revision to 2 CFR 200.340, did not formally go into effect until October 1, 2024, but OMB authorized Federal agencies to apply the changes to Federal awards issued prior to October 1, 2024. *Id.* at 30046. EPA chose to do so for all grant awards issued on or after July 3, 2024. *See* 89 Fed. Reg. 55262, 55263 (July 3, 2024).

Agreement, EPA deposited $398,338,508.00—roughly 78% of the total awarded funds—into ACC's Automated Standard Application for Payment ("ASAP") account, and ACC began performing under the agreement. Answer ¶ 33; Wallace Decl. ¶ 13.[9] As outlined in ACC's Grant Application and workplan, ACC operated the Green Bank for Rural America ("Green Bank") as a wholly owned subsidiary for the purpose of executing grant activities. Wallace Decl. ¶ 14. On or about September 3, 2024, ACC executed a subaward agreement with Green Bank for $489,838,175. *Id.* Green Bank was required to execute the community lender pass-through grants, providing $450 million to community lenders and overseeing the provision of technical assistance, community engagement, and workforce development services to those community lenders, as outlined in the workplan. *Id.* ACC retained the balance of the award to provide compliance, reporting, and oversight of the grant. *Id.*

Following approval of the Grant Agreement and workplan, Green Bank hired and/or contracted with a Chief Executive Officer, Chief of Staff, Chief Investment Officer, Chief Operations and Financial Officer, Head of Technical Assistance Services, Chief Marketing and Communications Officer, and multiple investment officers to implement the grant activities. *Id.* ACC paid employee salaries and benefits (and payments to contractors) to effectuate grant activities. Wallace Decl. ¶ 15.

ACC and Green Bank also began extensive efforts to make grants to local organizations and to develop their own capability to assist those organizations. Wallace Decl. ¶ 16. Green Bank conducted extensive work building technical assistance "hubs" to support community lenders that would finance eligible projects effectively and with the desired leverage and pollution reduction

[9] The full amount of the $500 million grant was not deposited at this stage due to litigation by an unsuccessful applicant. Each awardee had a pro-rated percentage of its respective award withheld, pending resolution of that litigation, which was ultimately unsuccessful. Wallace Decl. ¶ 13 n.1.

goals. *Id.* Green Bank entered into multi-million-dollar contracts with community engagement and workforce development partners to provide robust technical assistance services in underserved communities, as required by the Grant Agreement. *Id.* It issued a national request for proposal ("RFP") for consultants to provide technical expertise to community lenders on energy generation and efficiency projects. *Id.* Green Bank reviewed responses and began actively vetting providers. And Green Bank issued RFPs for human resources, accounting, and IT services, received many proposals, and began actively evaluating them. *Id.*

On October 28, 2024, Green Bank opened the first round of funding to community lenders serving communities impacted by Hurricane Helene. *Id.* ¶ 17. These communities had been devastated by the Category 4 Hurricane. *Id.* Green Bank received nine applications for funding and ultimately approved $67 million. *Id.* And on December 4, 2024, Green Bank launched the Open Round for community lenders serving Appalachia and rural communities nationally. *Id.* As of March 11, 2025, Green Bank had received over thirteen applications requesting $260 million in funding. *Id.* ¶ 28. In addition, at least fifteen community lenders were ready to submit applications or indicated that they planned to apply later in the year. *Id.*

## VI. The Revised Grant Agreement

On December 19, 2024, EPA and ACC entered into a revised Grant Agreement, which superseded the initial August 8, 2024 Grant Agreement. *See* Ex. 7 ("Revised Grant Agreement"); Wallace Decl. ¶ 19. The Revised Grant Agreement continued to authorize ACC to incur costs to advance the goals enumerated in the grant. Revised Grant Agreement at 1, 5, 11–12, 25. It also (1) included additional requirements under the Build America, Buy America Act, *id.* at 34–36; (2) required compliance with EPA's updated General Terms and Conditions, effective October 1, 2024, *id.* at 4; and (3) like the Initial Grant Agreement, required the grantees to enter into financial agent agreements under terms specified by EPA, *id.* at 54–55, which ACC had already done by

entering into an Account Control Agreement with Citibank and EPA as a secured party. Wallace Decl. ¶ 21. The Revised Grant Agreement also reiterated the limited circumstances in which the grants could be terminated, specifying that:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination.

Revised Grant Agreement at 43. That was consistent with the newly operative terms and conditions, incorporated in the Revised Grant Agreement, *id.* at 1, 4, which contained an identical paragraph specifying how and when the grant could be terminated. *See* Ex. 6 ("Revised Terms & Conditions") at 39. In short, the Revised Grant Agreement continued to provide that it could only be terminated based on (1) noncompliance with the terms and conditions, if such noncompliance meant that "effective performance . . . is Materially Impaired" or (2) "adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status." "Waste, Fraud, or Abuse" was in turn defined as "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733." Revised Grant Agreement at 14.[10]

The same section of the Grant Agreement also clarified the procedures that EPA was required to follow in the event it pursued termination:

> If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient

[10] "Materially Impaired" was defined as a "finding from EPA that the Recipient has failed to achieve sufficient progress" in accordance with the recipient's EPA-approved workplan. Revised Grant Agreement at 9–10, 42.

> selected under Funding Opportunity Number 66.960 (CCIA) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

*Id.* at 43.

All the while, ACC continued its performance under the Initial and Revised Grant Agreements. On or about December 20, 2024, EPA accepted ACC's workplan and budget under the Revised Grant Agreement. *See* Answer ¶ 38; Wallace Decl. ¶ 20. That workplan outlined in detail ACC's plan to use the $500 million award to fund community lenders who would, in turn, raise additional private capital to invest in low- or zero-energy emission projects. Wallace Decl. ¶ 20. Between November 6, 2024, and December 27, 2024, the entirety of ACC's $500 million award, less draws of $525,937, was transferred from the U.S. Treasury to the Fiscal Agent Account at Citibank For the Benefit Of ACC. Answer ¶ 39; Wallace Decl. ¶ 21.

In the first few months of 2025, in reliance on EPA's award to ACC, ACC through Green Bank issued capitalization and technical assistance awards to nine community lenders for an aggregate of approximately $67 million to serve communities across five states, all ravaged by Hurricane Helene. Wallace Decl. ¶ 22. For example, on January 7, 2025, Green Bank awarded a total of $11 million to Mountain BizWorks, a non-profit CDFI based in Asheville, North Carolina, for capitalization and technical assistance to finance low- and zero-emissions projects as part of the rebuilding of areas of western North Carolina damaged by Hurricane Helene. *Id.* On January 14, 2025, Green Bank awarded a total of $3.4 million to Albany Community Together, a Georgia nonprofit, to assist communities in Southeast and Central Georgia hit by Hurricane Helene. *Id.*

On January 29, 2025, Green Bank awarded a total of $11 million to Pathway Lending, a Tennessee nonprofit, to assist communities in eastern Tennessee and western North Carolina affected by Hurricane Helene. *Id.* Also on January 29, 2025, Green Bank awarded a total of $3,105,000 to Carolina Community Impact, Inc., a North Carolina nonprofit, to assist communities affected by Hurricane Helene. *Id.* And on February 26, 2025, Green Bank awarded a total of $11 million to CommunityWorks, a South Carolina-based nonprofit to assist communities affected by Hurricane Helene. *Id.*

### VII. EPA's Abrupt Termination of the Grant Agreement

ACC's vital work was put to an abrupt halt in early 2025. On January 20, 2025, President Trump signed an Executive Order directing all agencies to "immediately pause" the disbursement of funds appropriated through the Inflation Reduction Act.[11] On January 29, 2025, the Senate confirmed Lee Zeldin as EPA Administrator.[12] Zeldin made several public statements criticizing grants issued under the GGRF, calling them "wild"[13] and announcing that he would cancel "wasteful DEI and Environmental Justice Grants."[14] On February 12, 2025, Zeldin posted a video announcing that EPA intended to take control of grant funds disbursed under the Inflation

---

[11] *See* Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/ [https://perma.cc/SS7Q-XWK2].

[12] *See* Roll Call Vote 119th Congress – 1st Session, *On the Nomination (Confirmation: Lee Zeldin, of N.Y., to be Administrator of the Environmental Protection Agency)* (Jan. 29, 2025), https://www.senate.gov/legislative/LIS/roll_call_votes/vote1191/vote_119_1_00024.htm; *see also* Press Release, *Lee M. Zeldin Sworn in as 17th EPA Administrator*, https://www.epa.gov/newsreleases/lee-m-zeldin-sworn-17th-epa-administrator [https://perma.cc/5E7A-JGBZ] (noting that Zeldin was sworn in on January 29, 2025).

[13] @EPALeeZeldin, X (Feb. 19, 2025, 4:01 p.m.), https://x.com/epaleezeldin/status/1892318587961930086.

[14] @EPALeeZeldin, X (Feb. 22, 2025, 2:10 p.m.), https://x.com/epaleezeldin/status/1893377875220332772.

Reduction Act and that Citibank "must immediately return" the funding because, in Zeldin's view, the GGRF program did not permit sufficient government oversight.[15] Zeldin did not, however, allege any wrongdoing—much less a violation of federal criminal law, which is the standard required by the Revised Grant Agreement's terms and conditions for termination—on the part of ACC or other grant recipients.

ACC later received a letter from EPA, dated March 4, 2025, which criticized the GGRF as "the first of its kind in EPA history" and claimed it was a "rush job" with insufficient "oversight by the federal government." *See* Ex. 8 ("EPA Letter") at 1; Wallace Decl. ¶ 24. In the letter, EPA sent 35 requests for information and documents, with a requested response date of March 28, 2025, and warned that the failure to provide the requested information "will be considered a violation of the Grant Agreement and may result in further compliance actions." EPA Letter at 2–5. ACC began diligently to compile the information requested by EPA. Wallace Decl. ¶ 24.

EPA did not wait for a response. On March 11, 2025, EPA issued a letter terminating the Revised Grant Agreement with ACC, effective immediately. *See* Ex. 9 ("Termination Letter"); Wallace Decl. ¶ 25; Answer ¶ 3 (admitting that "on March 11, 2025, EPA unilaterally terminated the grant agreement"). In alignment with Zeldin's statements, and without seeking to impose any interim measures short of termination, the letter cited "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." Termination Letter at 1. Similarly, the Termination Letter generally referenced "multiple ongoing independent federal investigations" and "material deficiencies"

---

[15] @EPALeeZeldin, X (Feb. 12, 2025, 7:52 p.m.), https://x.com/epaleezeldin/status/1889840040622321778/; *see also* Zack Colman, *Recipient isn't giving in as Trump's EPA tries to revoke climate grants*, POLITICO (Feb. 24, 2025), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814.

regarding “adequate oversight and account controls to prevent financial mismanagement”; “improper or speculative allocation of funds inconsistent with EPA’s oversight and fiscal responsibilities”; and “the circumvention and defeat of key oversight mechanisms.” *Id.*

The letter stated that EPA had “considered concerns raised by EPA Administrator Lee Zeldin regarding the need for rigorous oversight and accountability in the administration of public funds” and claimed that “[t]he structural and operational weaknesses identified in the execution of this grant are inconsistent with these priorities and materially impair the EPA’s ability to ensure compliance with statutory and regulatory mandates governing the lawful expenditure of public money.” *Id.* at 1–2. Finally, the letter stated that EPA had “determined that its existing process for awarding and overseeing execution of the Grant Agreement lacks sufficient protections to guard against potential violations of the Constitution, particularly the Appointments Clause and private nondelegation doctrine,” and that EPA “has reconsidered the prior administration’s conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of EPA's oversight and ultimate approval.” *Id.* at 2.

What the Termination Letter did *not* cite was any evidence of performance issues, noncompliance with the terms and conditions of the Initial or Revised Grant Agreement, or waste, fraud, or material misrepresentation of eligibility status by ACC. The letter did not allege or cite findings that ACC was involved in or at fault for any of the purported “material deficiencies.” The letter did not allege or cite findings that ACC had failed to make sufficient progress in performing under the Initial or Revised Grant Agreement; indeed, EPA acknowledged elsewhere that it “did

not terminate for [grantees'] noncompliance."[16] Nevertheless, EPA claimed that the termination "is executed in accordance with Sections III.R and III.S.3 of the Grant Agreement" (*i.e.*, the sections of the Revised Grant Agreement governing "Remedies for Non-Compliance" and "Termination") and "with EPA's General Terms and Conditions as incorporated in . . . the terms of the Grant Agreement." *Id.* EPA stated that "[t]his letter constitutes the notice of termination required by 2 C.F.R. § 200.341" and directed ACC to cease operations under the Revised Grant Agreement. *Id.*

On April 10, 2025, counsel for ACC sent EPA a letter appealing the termination of the Revised Grant Agreement. *See* Wallace Decl. ¶ 30; Ex. 10 ("Appeal Letter"). ACC's letter explained that, to the extent that EPA's termination "was issued as a purported remedy to noncompliance," ACC disputed that (and any other) basis for terminating the grant. Appeal Letter at 1. Moreover, ACC noted, "[t]he termination letter failed to provide or identify any evidence of material failure to comply with terms and conditions of the award or evidence of waste, fraud or abuse," nor had EPA provided ACC "with an opportunity to cure any issues" as required by the Revised Grant Agreement. *Id.* at 1–2. Thus, as ACC's letter explained, "EPA's termination decision is in breach of the terms and conditions of the Grant[.]" *Id.* at 2. EPA never responded to ACC's letter. Wallace Decl. ¶ 30.

Around the same time EPA issued the Termination Letter, it also pressured Citibank, as the fiscal agent holding the funds awarded to ACC, to withhold the entire remaining balance from ACC, totaling nearly $500 million.[17] EPA issued materially identical termination letters to other

---

[16] *Climate United Fund v. Citibank, N.A.*, 25-cv-698, Dkt. 49 at 25 (D.D.C. Mar. 26, 2025) (government's memorandum of law).

[17] *Climate United Fund v. Citibank, N.A.*, 25-cv-698, Dkt. 14 at 1 (D.D.C. Mar. 12, 2025), (Citibank's statement that "Citibank has been instructed by EPA and the Department of Treasury to pause all further disbursements from GGRF accounts . . . until further notice," citing March 10,

recipients of GGRF awards.[18] ACC also responded to congressional inquiries regarding its stewardship of the GGRF funds, which did not result in any finding that ACC had engaged in any wrongdoing. Wallace Decl. ¶ 31.

EPA's sudden and drastic termination caused immediate harm to ACC. Most obviously, ACC had already obligated $67 million of its award to subrecipients. *Id.* ¶¶ 17, 22. But in light of EPA's termination, ACC no longer had the funds to comply with its obligations to subgrantees. *Id.* ¶ 29. Moreover, in reliance on the initial and revised Grant Agreements, ACC and Green Bank initiated performance and planned a decade of capitalization, fundraising, technical assistance, and financing for renewable energy projects in underserved areas. ACC intended to utilize Green Bank to implement its obligations under the Initial and Revised Grant Agreements, which ACC now cannot do. ACC will no longer be able to finance (through subgrantees) renewable energy projects in low-income and underserved communities that would have leveraged additional private capital, which would have collectively lowered costs while increasing renewable energy supplies and resilience in Appalachia and other rural parts of the country.

ACC now seeks relief for EPA's cavalier disregard of its obligations under the Grant Agreement.

---

2025 email from EPA); *see also* CNN, *Senior DOJ prosecutor quit after being told to investigate Biden climate spending* (Feb. 18, 2025) (reporting that senior prosecutor resigned after being pressured to open an investigation, without evidence, into award of funds held "in a bank related to the Biden-era EPA funding"), https://edition.cnn.com/2025/02/18/politics/justice-department-dc-criminal-division/index.html.

[18] *See* EPA Press Office, *Administrator Zeldin Terminates Biden-Harris $20B 'Gold Bar' Grants* (Mar. 11, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-terminates-biden-harris-20b-gold-bar-grants [https://perma.cc/384Z-M9PH].

## LEGAL STANDARD

Under RCFC 56(a), "[s]ummary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." *Anderson v. United States*, 23 F.4th 1357, 1361 (Fed. Cir. 2022). This Court "view[s] the facts supported by evidence, as well as all inferences drawn therefrom, in the light most favorable to the non-moving party." *Id.* "Contract interpretation is a question of law, which poses an appropriate question for summary judgment resolution." *Stathis*, 120 Fed. Cl. at 560.

## ARGUMENT

This Court should award summary judgment to ACC on liability for EPA's breach of contract. First, this Court has Tucker Act jurisdiction over this case, which the government has not disputed in this case and has conceded in related litigation.

Second, on the merits, this is an open-and-shut case of breach of contract: EPA awarded funds to ACC through a contract and breached that contract by terminating it for reasons that the contract did not permit. EPA's Termination Letter made clear the true reason for termination: the new administration's belief that the GGRF lacked sufficient safeguards and reflected "misalignment with the Agency's priorities." Termination Letter at 1. But that is no basis for the government to breach a valid contract where, as here, the contract did not authorize termination on that basis. Rather, under the Revised Grant Agreement, termination was authorized only if either (1) ACC failed to comply with the terms and conditions such that effective performance was materially impaired or (2) there was evidence of waste, fraud, or abuse by ACC, rising to the level of a federal crime or violation of the False Claims Act.

EPA has not alleged—much less substantiated—either basis for termination. And nothing in the Revised Grant Agreements permitted termination for the government's convenience or based on shifting agency priorities. EPA's breach caused ACC damages by withholding the grant

award that was contractually promised, rendering ACC unable to satisfy the obligations it had incurred in reliance on such promise, and preventing ACC from recouping the expenses it incurred in connection with beginning performance under the Grant Agreements.

Thus, the Court should hold that EPA breached the Revised Grant Agreement and award ACC partial summary judgment on liability with respect to Count I.

## I. **<u>This Court Has Tucker Act Jurisdiction Over ACC's Claims</u>**

This Court has jurisdiction under the Tucker Act to entertain ACC's claims. *See* 28 U.S.C. § 1491. The Supreme Court has held that when, as here, a plaintiff seeks money damages for unlawful termination of a federal grant, this Court is the proper forum in which to bring that claim. *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (holding that challenge to termination of education grants belonged in Court of Federal Claims); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (staying district court's termination of federal research grants for lack of jurisdiction); *id.* at 2661 (Barrett, *J.*, concurring) (concluding that challenges to grant terminations "belong in the Court of Federal Claims").

The Federal Circuit has likewise held that, in suits seeking money damages for termination of federal grants, Tucker Act jurisdiction is proper. *See Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1364, 1366 (Fed. Cir. 2021) (holding jurisdiction was proper in this Court based on government's alleged breach of agreement awarding operating subsidy). Where, as here, a grant agreement obligates funds to the recipient, that suffices to make the agreement a money-mandating source of funds under the Tucker Act. *See id.* at 1364–70 (noting that "there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement," which "normally satisfies the money-mandating requirement for Tucker Act jurisdiction" (internal quotation marks omitted)); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1341 (Fed. Cir. 2021) (holding jurisdiction was proper in case alleging breach of federal grant agreement because

"[a]s a general rule, if a plaintiff alleges breach of a contract with the government, the allegation itself confers power on the Claims Court to decide whether the claim has merit"); *id.* at 1351–52 (same where plaintiff sought "monetary relief in the form of a request for the release of funds" that the government had purported to reclaim).

The government itself has repeatedly conceded, both in this case and in related litigation, that jurisdiction is proper in this Court. In this case, the government has stated that it "is unaware of any basis upon which to challenge the Court's jurisdiction at this time." Dkt. 20 at 1. And in a similar litigation brought in the district court by several GGRF grant recipients (not including ACC) that sought to enjoin EPA's termination of grant agreements like those received by ACC, the government contended that *only* this Court had jurisdiction under the Tucker Act. *See Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 107–11 (D.D.C. 2025) (describing government's Tucker Act argument before rejecting it and granting relief under the Administrative Procedure Act and constitutional claims).

On *en banc* review before the D.C. Circuit in the *Climate United* case, the government repeatedly argued that the GGRF grant agreements were contracts such that jurisdiction was proper only in this Court. *See, e.g.*, EPA En Banc Br. at 6 ("In August 2024, EPA and the recipients entered into materially identical contracts memorializing the grant awards."); *id.* at 19 ("If plaintiffs are correct that EPA violated the grant agreements, they can seek monetary relief in the Court of Federal Claims."); *id.* ("If the terminations were unlawful as plaintiffs claim, that could only be because EPA breached the agreements, which is definitionally a contractual claim."); *id.* at 23 ("Under the Tucker Act, Congress has assigned the Court of Federal Claims exclusive

jurisdiction to adjudicate the sorts of claims at issue in this case[.]").[19] And although the D.C. Circuit *en banc* ultimately affirmed the district court's preliminary injunction, apparently rejecting the government's jurisdictional argument, *see* 184 F.4th 679, the government has not disputed that breach of contract claims, like the one ACC pursues here, are proper in this Court; the only dispute between the parties in *Climate United* has been whether the claims pursued there are "essentially contractual" such that they must be brought in this Court. *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 820 (D.C. Cir. 2025), *vacated on rehearing en banc*, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025).[20]

This Court has jurisdiction over ACC's claims.

## II. <u>ACC is Entitled to Partial Summary Judgment on Liability for its Contract Claim</u>

This Court should award ACC summary judgment on liability for its breach of contract claim (Count I of the Complaint). "To recover for a breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020) (internal quotation marks omitted). Here, ACC's Grant Agreement with EPA is a contract that imposed obligations on both ACC and EPA. EPA breached

[19] *Climate United Fund v. Citibank, N.A.*, No. 25-5122, Doc. No. 2153666 (D.C. Cir. Jan. 9, 2026) ("EPA En Banc Br.").

[20] The D.C. Circuit stayed its mandate in *Climate United* pending the government's petition for certiorari, *see* 2026 WL 2450279 (D.C. Cir. Aug. 7, 2026) (en banc), which was filed today, November 2, 2026, and which repeats the government's argument that jurisdiction is proper only in this Court. *See Zeldin v. Climate United Fund* (Supreme Court docket number pending). ACC reserves the right to file a supplemental suit in district court as circumstances warrant. *Cf. Nat'l Insts. of Health*, 145 S. Ct. at 2661–62 (Barrett, *J.*, concurring) (concluding that in some circumstances, a plaintiff must proceed in "[t]wo-track litigation" before this Court and district court); *Ute Indian Tribe v. United States*, 99 F.4th 1353, 1375 (Fed. Cir. 2024) (holding that this Court has concurrent jurisdiction with district court so long as district court action is filed after action in this Court).

that contract by terminating the Revised Grant Agreement—and withholding or failing otherwise to provide the promised funds—for reasons other than those authorized in the contract. The contract did *not* permit EPA to terminate due to shifting agency priorities or a generalized belief that the GGRF should not have been created. And EPA did not even purport to invoke grounds authorized by the Revised Grant Agreement when issuing the termination notice. ACC is thus entitled to summary judgment on liability.

### A. <u>The Grant Agreements Are Contracts</u>

ACC's Initial and Revised Grant Agreements with EPA are binding contracts. The Federal Circuit and this Court have repeatedly held that "federal grant agreements [are] contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Columbus Reg'l Hosp.*, 990 F.3d at 1338 (collecting cases); *see also Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 415 (1995) (holding that grant agreement with federal government constituted a contract on which grantee could sue for breach); *Cmty. Rels.-Soc. Dev. Comm'n in Milwaukee Cnty. v. United States*, 8 Cl. Ct. 723, 725 (1985) ("Defendant contends that a grant is not a contract, as it evinces no contractual language or intent to be bound. This question, however, has already been laid to rest by the Court of Claims, which has held that a notice of a federal grant award in return for the grantee's performance of services can create cognizable obligations to the extent of the government's undertakings therein.").

The Grant Agreements here were structured as contracts. Each of the "standard conditions for a contract" was present: (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States. *Columbus Reg'l Hosp.*, 990 F.3d at 1339 (citing *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1364 (Fed. Cir. 2005)).

As to the first element, a mutual intent to contract, the Grant Agreements make clear that the parties intended to contract, as "the language of the agreement itself speaks in terms of binding obligations, not aspirations." *Id.* Among other things, the Grant Agreement uses clear, declarative language that EPA "hereby awards" $500 million to ACC in exchange for performance by ACC. *See* Grant Agreement at 1; *see also* Revised Grant Agreement at 1 (authorizing 100% cost-sharing up to $500 million). The Grant Agreements (and the incorporated Terms and Conditions) also imposed numerous requirements on ACC, including (1) directing how ACC uses the award, Grant Agreement at 4, 14–17, 20; Revised Grant Agreement at 14–17, 20; (2) requiring ACC to comply with corporate governance requirements, financial risk management procedures, and conflict of interest rules, Grant Agreement at 35, 37, 44; Revised Grant Agreement at 36, 38–39, 45; (3) directing ACC to maintain the funds in a specific type of deposit account, *id.* at 58; and (4) imposing numerous other reporting, contracting, labor, record-keeping, and audit requirements, among others, *id.* at 14–18, 28–34, 46–47. These requirements are "objective evidence of the parties' intent to be bound by the agreement." *Columbus Reg'l Hosp.*, 990 F.3d at 1339.

The second element of a contract, offer and acceptance, "is easily satisfied in this case." *Id.* An offer occurs when a government agency "drafted the documents bearing the details of the grant agreement and presented those documents to the" grantee. *Id.* Here, EPA drafted the contract contained in the Grant Agreement (which appears on EPA letterhead), along with the terms and conditions incorporated therein. *See* Grant Agreement & Revised Grant Agreement at 1. It therefore qualifies as an offer "to enter into a bargain and justified [the grantee's] understanding that its assent would consummate the bargain." *Columbus Reg'l Hosp.*, 990 F.3d at 1339. And ACC manifested its acceptance according to the terms of the contract: as the Grant Agreement explained, "[t]he recipient demonstrates its commitment to carry out this award by

either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date." Grant Agreement & Revised Grant Agreement at 1. ACC accepted the contract by drawing down the funds within 21 days of the award, not filing a notice of disagreement with any of the terms in EPA's award, and beginning work under the contract. *See Thermalon Indus.*, 34 Fed. Cl. at 415 (government's issuance of an award "constitutes either an acceptance of plaintiff's offer or, in the alternative, a counteroffer which plaintiff accepted when it commenced work on the grant project").

Third, the Grant Agreements were supported by consideration. EPA agreed to obligate $500 million to ACC and, as discussed above, ACC agreed to numerous requirements in how it spent and managed that money and agreed to engage in commercially reasonable efforts to raise more private capital than it received in grant funding. "The conditions attached to the [EPA] grants constitute consideration because they imposed a variety of duties on [ACC] in implementing the [Grant] Agreement." *Columbus Reg'l Hosp.*, 990 F.3d at 1340. A party's performance in compliance with conditions has long been understood as consideration. *See* Restatement (Second) of Contracts § 71 cmt. D ("Consideration may consist of a performance or of a return promise."); *McGee v. Mathis*, 71 U.S. 143, 155 (1866) ("It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State, constituted a contract. All the elements of a contract met in the transaction[]—competent parties, proper subject-matter, sufficient consideration, and consent of minds."); *accord Laborant, LLC v. United States*, 180 Fed. Cl. 76, 86–87 (2026) (requirements that contractor "maintain appropriate records and documentation," "submit reports to the Secretary," and agreement to comply with other requirements were "sufficient to supply consideration").

For similar reasons, the Revised Grant Agreement, in December 2024, was supported by valid consideration because it imposed additional requirements on both parties. For its part, ACC agreed to abide by additional requirements related to the Build America, Buy America Act (*compare* Grant Agreement at 34 *with* Revised Grant Agreement at 34–36) and to comply with all requirements incorporated in the revised Terms and Conditions even if those requirements were later "deleted, repealed, rescinded or replaced." Revised Terms & Conditions at 50. EPA, in turn, agreed that it would not determine that ACC "has failed to comply with the terms and conditions of the Award Agreement[] without providing a reasonable opportunity to remedy" any alleged issues. Revised Grant Agreement at 38. The Revised Grant Agreement also newly defined the terms "Materially Impaired" and "Waste, Fraud or Abuse"—two key terms in the provision of the Revised Grant Agreement governing termination—in a manner that benefited ACC by granting heightened procedural and substantive protections. *Id.* at 9–10, 14, 43. These changes sufficed to create consideration for the revised Grant Agreement. *See Gardiner, Kamya & Assocs., P.C. v. Jackson*, 369 F.3d 1318, 1322–23 (Fed. Cir. 2004) (contract modification was supported by consideration where one party agreed to continue performance in exchange for new terms). And EPA itself acknowledged, in its termination letter, that the Revised Grant Agreement was the operative one when it stated that the termination was "executed in accordance with Sections III.R and III.S.3 of the Grant Agreement." Termination Letter at 2. Section III.S.3 is the provision of the *Revised* Grant Agreement governing termination, whereas Section III.S.3 of the Initial Grant Agreement covers a different topic (namely, EPA's right to assess whether ACC was "making sufficient progress in implementing the EPA-approved workplan under this Assistance Agreement"). *Compare* Grant Agreement at 41 *with* Revised Grant Agreement at 43.

Fourth and finally, the Grant Agreements were authorized by government representatives with actual authority to bind the United States. The Grant Agreements were on EPA letterhead, designated a "U.S. Environmental Protection Agency Grant Agreement," and included an EPA Grant Number. Grant Agreement & Revised Grant Agreement at 1. The Grant Agreements were likewise signed by Phillip Schindel (with his title listed as "Chief, Business Operations Branch") and included Zachary McNealy as the EPA Project Officer and Brandon Pierce as the EPA Grant Specialist. *Id.* Thus, there can be little doubt that the fourth element, actual authority, is satisfied.

In short, the Grant Agreements are binding contracts between EPA and ACC. Indeed, the government admitted as much in its arguments to the D.C. Circuit. *See* EPA En Banc Br. at 6 ("In August 2024, EPA and the recipients entered into materially identical contracts memorializing the grant awards."); *id.* at 19 ("The right to payment that plaintiffs seek to vindicate arises from their contracts with EPA, not any statute or regulation."); *id.* ("If anything, this case involves more clear-cut contractual claims than those the Supreme Court considered: Plaintiffs' argument is premised on the alleged violation of a term of their agreements that ostensibly restricted the circumstances in which EPA could terminate the agreements. If the terminations were unlawful as plaintiffs claim, that could only be because EPA breached the agreements, which is definitionally a contractual claim."); *id.* at 28 ("This is a contract case through and through. The grant agreements are plainly 'the source of the rights upon which' plaintiffs base their claims." (citation omitted)); *id.* at 28 n.3 ("the Supreme Court's recent stay orders are premised on the understanding that these kinds of grant agreements are contracts"). The government is right that it entered contracts with GGRF grant recipients like ACC.

### B. <u>The Grant Agreements Imposed Obligations and Duties Arising Out of the Contracts</u>

Next, the Grant Agreements imposed on the government an obligation or duty arising out of the contract. The relevant obligation here is plain: EPA agreed to award $500 million to ACC and "to cost-share <u>100.00%</u> of all approved budget period costs incurred," including for pre-award expenses and accrued program income. Grant Agreement & Revised Grant Agreement at 1, 5–6, 22–23 (emphasis in original); Grant Agreement at 4 ("This agreement provides funding under the Inflation Reduction Act (IRA) to Appalachian Community Capital Corporation."); *see Claude Mayo Constr. Co. v. United States*, 132 Fed. Cl. 634, 637 (2017) (holding that where government agreed to pay money, that is "an obligation or duty arising from its contract"). That is the very obligation and duty that ACC seeks to enforce here.

Because EPA obligated funds in a contract with ACC, it is of no moment that Congress in July 2025 rescinded "*unobligated* balances of amounts made available to carry out" the GGRF. Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (2025) (emphasis added). First, there was no rescission of the award to ACC because that award was already "obligated." *See Rhode Island AFL-CIO v. U.S. Env't Prot. Agency*, --- F. Supp. 3d ---, 2026 WL 2797310, at *2, *7 (D.R.I. Sept. 18, 2026) (holding that, under § 60002, "existing grants were not to be rescinded" and that "Congress's clear intent was that EPA continue to administer the already obligated [GGRF] grants"); *accord Harris Cnty. v. U.S. Env't Prot. Agency*, --- F. Supp. 3d --, 2026 WL 2837849, at *1 n.1 & *7 (D.D.C. Sept. 22, 2026) (holding that § 60002 did not authorize the government "to claw back funds that had already been obligated" and that grants were obligated upon execution of grant agreements).

And regardless, because EPA entered a contract with ACC, the government could not repudiate that obligation by statutory repeal, at least not without more clearly specifying that

Congress was also barring claims for breach in this Court. *See Cardiosom, L.L.C. v. United States*, 656 F.3d 1322, 1330 (Fed. Cir. 2011) (holding that when Congress repealed statutory authority to contract and directed the government to terminate contracts, "the legal consequences of the terminations can still be determined under existing federal law governing contract disputes with the Government"); *see also Crestview Clinical Lab'y, LLC v. United States*, 181 Fed. Cl. 1, 24–25 (2026) (holding that rescission of "unobligated" funds did not extinguish claim for breach of contract because other funds could be used to satisfy a judgment in plaintiff's favor).

### C. <u>EPA Breached the Operative Revised Grant Agreement by Failing to Terminate on an Authorized Ground</u>

EPA breached the operative Revised Grant Agreement by terminating it for reasons not authorized by the contract and not substantiated by EPA. Under the Revised Grant Agreement, EPA was permitted to terminate *solely* if ACC's "noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339," in which case EPA was required to "re-obligate" remaining funds "to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act" (*i.e.*, the GGRF) within 90 days. Revised Grant Agreement at 43.

But EPA's March 11, 2025, termination letter did not invoke any permitted ground for termination, rendering the purported termination a breach of contract. EPA made clear that it was terminating the Revised Grant Agreement because the new administration disfavored the GGRF, the prior administration's decision to award grants, and the manner in which EPA's grant agreements were structured. The termination letter stated outright that "EPA has reconsidered the prior administration's conclusion that the oversight mechanisms for the Grant Agreement are sufficient to ensure that the Recipient will not exercise significant authority independently of

EPA's oversight and ultimate approval." Termination Letter at 2. Critically, EPA did *not* assert any noncompliance by ACC with the terms and conditions; rather, it claimed to have identified "material deficiencies" in the program as a whole—not related to ACC specifically—including "1) the absence of adequate oversight and account controls to prevent financial mismanagement; 2) the improper or speculative allocation of funds inconsistent with EPA's oversight and fiscal responsibilities; and 3) the circumvention and defeat of key oversight mechanisms in the disbursement of federal funds." *Id.* at 1. EPA claimed that "these deficiencies pose an unacceptable risk to the efficient and lawful execution of this grant that cannot be remedied by imposing specific conditions." *Id.*

Nothing in the Revised Grant Agreement permitted EPA to terminate its contract with ACC based on the new administration's view that the grants should not have been awarded or that the oversight mechanisms established by the Agreement were insufficiently favorable to the government. *See* Termination Letter at 1–2 (focusing on alleged absence of sufficient oversight as principal basis for termination, along with "misalignment with the Agency's priorities"). To the contrary, both the Initial and Revised Grant Agreement ruled out the possibility that the failure to effectuate agency priorities could be a valid basis for termination, by incorporating the October 2024 revision to 2 C.F.R. § 200.340 that required the agency to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *See supra* at 8–9, 11–13. Neither version of the Grant Agreement permitted termination based on EPA's shifting priorities.[21]

[21] Indeed, even if the terms and conditions *had* authorized termination of the Grant Agreement based on the agency's conclusion that "an award no longer effectuates the program goals or agency priorities," that would not have authorized termination based on *new* agency priorities. *See New Jersey v. U.S. Off. of Mgmt. & Budget*, 837 F. Supp. 3d 258, 283 (D. Mass. 2026) (holding that 2 C.F.R. § 200.340 "do[es] not allow terminations of awards based on new program goals or agency

If EPA had specific concerns regarding oversight of the GGRF program, it might have been able to increase its oversight—although ACC was already subject to numerous reporting and oversight requirements, as outlined above. *Supra* at 8, 12, 24. Indeed, EPA was required to consider measures short of termination to cure any perceived problems with performance but failed to do so, which constituted an independent breach of contract. *See* Revised Grant Agreement at 43; 2 C.F.R. § 200.339 (permitting agency to terminate award only if the agency "determines that noncompliance cannot be remedied by imposing specific conditions"); *see also supra* at 15 (noting that EPA did not wait for ACC's response to its March 4 letter before terminating the agreement or otherwise seek to remedy any alleged issues). What EPA was *not* permitted to do was terminate the Revised Grant Agreement for reasons other than those authorized by the Agreement. And nothing in the Revised Grant Agreement authorizes EPA to terminate the Agreement based upon a purported concern with the sufficiency of the oversight mechanisms that *EPA agreed to in the Agreement*. *See, e.g.*, *Gateway Dev. Comm'n v. United States*, 180 Fed. Cl. 495, 515 (2026) (observing that, in case involving grants and loans, Department of Transportation "took a 'ready, fire, aim' approach to its withholding of GDC's disbursements," which "approach is facially inconsistent with the requirements imposed by the agreements and applicable regulations"); *Idaho Migrant Council v. United States*, 9 Cl. Ct. 85, 89 (1985) ("The United States, when it makes a grant, must abide by the terms of the grant instrument and comply with applicable regulations.");

---

priorities that an agency identifies after granting the award"), *appeal docketed*, No. 26-2210 (1st Cir.); *accord State of California v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2026 WL 2754968, at *30–31 (D. Mass. Sept. 17, 2026) (same). Rather, when the terms and conditions authorize termination on the ground that an award "no longer effectuates the program goals or agency priorities," that requires the agency to find "that the original goals can no longer be met, either because the specific project cannot achieve those goals or because they are unachievable." *New Jersey*, 837 F. Supp. 3d at 281.

*supra* at 8, 12, 24 (detailing certain oversight mechanisms contained in Grant Agreements).[22]

EPA's passing reference to "programmatic fraud, waste, abuse and conflicts of interest" does not rise to the level of a permitted basis for termination. Termination Letter at 1. First, the only examples given of such alleged misconduct are generalized and unsubstantiated concerns regarding oversight of the GGRF program. *Id.* Moreover, the operative Revised Grant Agreement defines "Waste, Fraud, or Abuse" as "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act, 31 U.S.C. 3729-3733." Revised Grant Agreement at 14. EPA's termination letter does not purport to cite any "credible evidence" of any violation of fraud or corruption statutes or the False Claims Act, so it did not invoke a permitted ground for termination. And, indeed, a subsequent congressional inquiry resolved without any finding that ACC had engaged in misconduct. Wallace Decl. ¶ 30. Nor can a subsequent administration assert—as a basis for terminating a valid contract—that the goals enumerated in a grant agreement are per se waste. *See Am. Council of Learned Societies v. Nat'l Endowment for the Humans*., 2026 WL 1256545, at *58 (S.D.N.Y. May 7, 2026) (rejecting government's termination of anti-discrimination grant programs on the asserted ground that all such programs amounted to wasteful DEI spending).

If more were needed, EPA also breached the contract's requirement that, in the event of termination, EPA would ensure that ACC: (1) could satisfy any obligations it had already incurred (such as the subgrants already awarded) and (2) would repurpose all other remaining funds to other

[22] Nor did the Grant Agreement permit EPA to terminate for "convenience." *See JKB Sols. & Servs., LLC v. United States*, 18 F.4th 704, 708 (Fed. Cir. 2021) (explaining that the government "may only terminate a contract for the convenience of the government—i.e., where there has been no fault or breach by the non-governmental party—if the contract has an applicable termination for convenience clause"). In any event, EPA did not state that its termination was for convenience.

eligible GGRF grant recipients. *See* Revised Grant Agreement at 43. EPA satisfied neither obligation; it has neither agreed to satisfy ACC's existing obligations nor to transfer unobligated funds to other GGRF grant recipients. Instead, EPA shuttered the program based on the new administration's view that the GGRF did not accord with its "priorities." Termination Letter at 1. But the Revised Grant Agreement made clear that is precisely what EPA may not do.

In short, EPA terminated the Revised Grant Agreement for reasons other than those authorized in the Agreement. It thereby breached its contract with ACC. *See Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 626 (2020) ("The failure to pay money when due and owing is a paradigmatic breach of contract claim.").

**D. <u>EPA's Breach Caused ACC Damages</u>**

Although ACC does not here seek summary judgment with respect to the *amount* of damages, there is no question that EPA's breach of the Revised Grant Agreement in fact *caused* ACC damages. Indeed, it is bedrock law that "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004) (internal quotation marks omitted); *id.* at 1360–63 (holding, in context of federal grant agreement, that Court of Federal Claims should decide whether government breached the agreement before assessing compensable categories of damages); *see also Sonoma Apartment Assocs.*, 124 Fed. Cl. at 601 (granting plaintiff's "motion for partial summary judgment as to the government's liability for breach of contract" and ordering parties to confer on schedule to adjudicate "the quantum of plaintiff's damages"); *Cuyahoga Metro. Hous. Auth.*, 57 Fed. Cl. at 781–82 (similar).

ACC has incurred at least the following categories of damages as a result of the government's breach of contract: (1) compensatory damages measured as the loss of its ability to

receive and utilize the $500 million in grant money (plus accrued program income) promised in the Initial and Revised Grant Agreements; (2) reliance damages presented by the obligations to its subgrantees that ACC has incurred as contemplated by the initial and Revised Grant Agreements; and (3) additional reliance damages represented by the costs that ACC has already incurred in reliance upon the government's broken promise.[23]

*First*, ACC is entitled to damages arising from the government's failure to provide the $500,000,000—plus the accrued interest that constitutes "program income"—that it "hereby award[ed]" to ACC in the Initial Grant Agreement and reiterated in the Revised Grant Agreement. As set forth above, that was a contractually binding promise, and the government's failure to honor that promise requires a damages judgment calculated as the difference between what the government promised to ACC and the amount that it provided. Indeed, the Federal Circuit has held that even when grant agreements impose certain restrictions on the grantee's use of funds, the grantee is entitled to pursue the difference between what the government provided and what the grantee was promised. *See Boaz Hous. Auth.*, 994 F.3d at 1369–70 ("We do not agree that a money damages award would overcompensate the [plaintiffs]. . . . Here, had HUD performed its contractual obligation, the [plaintiffs] would have received their prorated operating subsidy and been subject to the use restrictions incorporated into the contract. They instead received less than their pro rata share, so compensatory damages of the difference places them in as good a position as they would have been had HUD fully performed its obligation under the [agreements]. That the [plaintiffs] would have been contractually bound to use their prorated operating subsidy in accordance with all applicable statutes and HUD regulations had HUD not breached is irrelevant to whether their money damages award compensates them for HUD's breach." (internal citations

[23] ACC reserves all rights to supplement or elaborate on these categories in further proceedings.

omitted)); *Columbus Reg'l Hosp.*, 990 F.3d at 1352 (holding that where plaintiff "seeks monetary relief in the form of a request for the release of funds that FEMA has recovered, nothing about that request for relief is inconsistent with a contract-based claim"); *Slidell*, 149 Fed. Cl. at 629 (grantee may "seek[] contract damages (in the form of a money judgment) for the government's failure to pay what is allegedly due to [plaintiff] under the [agreement]—a classic breach of contract claim").

*Second*, and in the alternative, ACC is entitled to pursue damages incurred as a direct and foreseeable result of the government's unauthorized termination of the Grant Agreements: specifically, ACC's obligations to commit capital promised to its subgrantees, in reliance upon the Grant Agreements. *Supra* at 13–14. Put simply, the government's breach exposes ACC to the prospect of damages liability to subgrantees for ACC's inability to fulfill the awards promised to such subgrantees—awards that were expressly predicated upon the government's promises set forth in the Grant Agreements. *See Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997) (contractor was entitled to recover from the United States for cost of settlement with subcontractor arising from the government's breach, since "[t]he general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation"); *accord SGS-92-X003 v. United States*, 85 Fed. Cl. 678, 710 (2009) ("A party that establishes a breach of contract may recover expectancy damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." (internal quotation marks omitted)). Thus, because the government induced ACC to enter contracts with subgrantees, for which the government would provide the requisite funds, the government is at minimum liable for damages in the amount ACC awarded.

*Third*, ACC is entitled to pursue damages arising from the costs it expended when performing under the Grant Agreements, including salaries for staff, payments to contractors, building its and Green Bank's technical capacity to assist grantees, the cost of outreach to community lenders, and similar out-of-pocket expenses. *Supra* at 10–11. Those were compensable expenses under the Grant Agreements and approved workplan, and ACC is entitled to recoup those costs to place it in no worse a position than if it had never entered the contract with the government. *See Am. Cap. Corp. v. F.D.I.C.*, 472 F.3d 859, 867 (Fed. Cir. 2006) (plaintiff may recover "expenditures made in preparation for performance or in performance" (internal quotation marks omitted)).

To reiterate, ACC does not now seek summary judgment on damages or seek a ruling on which categories of damages are compensable. Rather, ACC outlines these categories of damages merely to establish what the case law makes obvious: that when the government breaches a contract, the non-breaching party is entitled to damages. *See Ravi v. United States*, 104 F.4th 1359, 1363 (Fed. Cir. 2024) ("It is well established that there is a strong general presumption that for a breach of a contract with the government, monetary remedies are available under the Tucker Act."); *LaBatte v. United States*, 899 F.3d 1373, 1379 (Fed. Cir. 2018) ("Typically, based on that presumption, no further inquiry is required into whether money damages are available." (internal quotation marks omitted)); *see also* EPA En Banc Br. at 21 (arguing in the D.C. Circuit that "any financial harms could be remedied by a final judgment awarding them appropriate monetary relief in the Court of Federal Claims").

Thus, there is no impediment to this Court's entering partial summary judgment on the issue of liability, with the parties then conferring on additional proceedings necessary to resolve

ACC's claim for damages. *See, e.g.*, *Sonoma Apartment Assocs.*, 124 Fed. Cl. at 601; *Cuyahoga Metro. Hous. Auth.*, 57 Fed. Cl. at 781–82.

## CONCLUSION

As the Supreme Court has recently reiterated, "[i]f men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021); *see WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 255 (2021). EPA failed to do so here. It terminated the Revised Grant Agreement on a ground that the contract never permitted—a new administration's change of policy. Because EPA's breach rests on undisputed facts, this Court should hold that EPA violated the contract and award partial summary judgment to ACC on liability with respect to Count I of the Complaint. Alternatively, should the Court decline to grant partial summary judgment on liability with respect to Count I of the Complaint, Plaintiff respectfully requests that the Court enter an order pursuant to RCFC 56(g) identifying those material facts that are not genuinely in dispute and treating them as established for all further proceedings in this action.

Dated: New York, N.Y.
November 2, 2026

Respectfully submitted,

**WALDEN HARAN WILLIAMS LLP**

By: /s/ *Jeffrey A. Udell*

Jeffrey A. Udell (admitted *pro hac vice*)
Samuel J. Rosh (admitted *pro hac vice*)
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
judell@whwllp.com
srosh@whwllp.com

**DEMOCRACY DEFENDERS FUND**

Lindsay W. Zimliki
600 Pennsylvania Avenue SE, Suite 15180
Washington, D.C. 20003
Tel: (202) 594-9958
lindsay@democracydefenders.org

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished by CM/ECF to all counsel of record on this 2nd day of November 2026.

/s/ *Jeffrey A. Udell*